The plaintiff’s were churchwardens and vestrymen of the upper parish, in the county of Nansemond, and filed a libel in the General court, as a court of ecclesiastical jurisdiction, against the defendant, charging that he was minister of the gospel of Christ, regularly ordained, according to the rites of the church of England ; that he was received to the care of the said parish; that he was of evil fame and profligate manners ; that he was much addicted to drunkenness, in so much, as to be often drunk at church, and unable to go through divine service, or to baptize or marry those who attended for those purposes; that he officiated in ridiculous apparel unbecoming a priest; that he was a common disturber of the peace, and often quarrelling and fighting ; that he was a common and profane swearer; that on the 10th of July 1767, and at other times, he exposed his private parts to view in public companies, and solicited negro and: other women to fornication and adultery with him; that he neglected the parochial duties of performing divine service, preaching and administering the sacrament of the Lord’s supper ; that he had declared he did not believe in the revealed religion of Christ, and cared not of what religion he *97 was so he got the tobacco, nor what became of the flock so that he could get the fleece. Wherefore the libellants prayed that the said Patrick Liman might be corrected, punished and deprived, or otherwise, that right and justice might be administered. The defendant pleaded to the jurisdiction of the court, and on that plea it came to he argued in October 1771. •
Wythe, for the libellants,
and in support of the jurisdiction, read the fourth section of the act of Assembly, 1748, c. 6. copied from the act of 1705, c. 19. s. 5. declaring the jurisdiction of the General court in these words, ‘ That the said General court shall take cognisance of, and are hereby declared to have power and jurisdiction to hear and determine, all causes, matters and things whatsoever, relating to or concerning any person or persons, ecclesiastical or civil, or to any persons or tilings of what nature soever the same shall be, whether brought before them by original process, appeal from any inferior court, or by any other ways or means whatsoever.’ And that the intention of the legislature was as general as their words, he produced every proof of which a matter so plain could admit. These arguments were not taken down, but their whole scope was to prove the General court possessed ecclesiastical jurisdiction, which, as he took it for granted, proved that it had a power of depriving ecclesiastics.
I was of* counsel for the libellant also, and though I thought the ecclesiastical jurisdiction of the court established beyond a doubt, yet I conceived it did not follow thence that they might deprive the defendant of his jiarish, because visitation and deprivation are no parts of the office of an ecclesiastical judge. To prove this it was proposed,
To enquire into the first establishment of Christian churches in Great Britain;
To develope their several kinds and constitutions;
To see who is entrusted with their care and visitation; and to apply the principles which this enquiry would evolve to the parochial churches of our own country.
On the first introduction of Christianity into Great Britain, it is certain there were no parochial divisions. The bishops and their clergy lived in common, and occasionally sent out itinerant preachers, to those places where the people seemed disposed to receive them. But when the number of converts became considerable, and the tract of country they occupied extensive, this occasional mission was found inconvenient, and a division into districts or parishes took place. This is supposed by some to have been in the time of Archbishop Honorius, anno, 636. But Mr. Selden and others think it of later origin. It is not pretended that this division was then made, as it now remains, into small parishes : it is probable that at first they were few and large, till time and the progress of conversion, made it necessary to divide and subdivide them. 3 Burn’s Eccles. Law, 58.
The King, his great lords and thanes, for the accommodation of their tenants, having built churches on their manors, obliged their tenants to pay tythes to these churches : for though a law of Ethelwolf, so early as the year 854, (Hume’s History of England) had given tythes to the clergy, yet it left the people at liberty to pay them where and to whom they pleased ; a grievance to the drones among the ecclesiastics, not entirely rectified till a law of King Edgar, c. 1. obliged them to pay them to the mother church of the parish. ‘ Dentur omnes décima; primarice, ecclesice ad quam parochia pertinet.’ 1 Bl. 112. The church being situated then on the soil of the lord, being built by himself, and the tythes paid from his tenements and tenants, gave him a natural right to employ any clerk for the celebration of divine service, whom he should choose. 1 Inst. 119. b. The same circumstances would give him a right to remove the clerk, whenever he should become deficient in duty. Hence arose the rights of donation, or the disposition of church livings, by laymen. 1 Bl. 111. Gibs. 819. Watson, c. 15.
In process of time, however, an encroachment was made by the bishops, on some of the lay patrons who possessed churches of the donative kind. They insisted, and in some instances prevailed on the patron, to give the bishop a right of previously examining the person to whom the church was to be given. For this purpose the patron was to present him to the bishop, who on examination admitted him able, and instituted him into the cure, or refused Win altogether; and a maxim was soon established of 11 once presentative and always presentative.’ 1 Inst. 344. a. This innovation is said by Selden, to have been introduced by that pious saint and martyr Thomas a’Becket, in the time of Henry II. Seld. tyth. c. 12. But Lord Coke, seems to think it was not done till the time of Pope Innocent III., which was in the reign of our John. 3. Inst. 201. And thus was introduced a second class of churches distinguished by the name of presentatives.
Of the residue of the parishes, after the donatives and presenta-tives were taken off, the bishops and clergy still retained die care, and appointed persons to officiate at the several churches. These churches, they doubtless, sometimes built themselves, and sometimes procured leave to convert the old British temples into Christian churches, and so may, in some degree be considered as the founders of them. 3. Bum. E. L. 59. Light as this foundation was, it gave them some color for collating the clerk, and tills having been exercised by them from the infancy of Christianity, has acquired the force of immemorial custom, and given reality to the right now known by the name of collation. So that at present, churches are comprehended as Dr. Blackstone rightly says, under the classes of donatives, presentatives and collatives. 2 BL 22. Donatives are those churches originally founded and endowed by the crown or a lay subject, or perhaps by both,-which lie merely in the gift of the lay patron, whose deed of donation is an absolute investiture of the clerk, without presentation to the bishop or any other ceremony. Presentatives are churches originally founded in the same manner by a lay patron, and which, though at first donatives, were by encroachment of the bishops subjected to presentation to them for their examination, admission, or refusal. The reasons of refusal, are, however, examinable by the temporal courts on an action of Quare impedit, if brought by the patron. 2 Inst. 631. Collatives are those remnants of the old parishes, left after the King and great men had taken oft’ their manors, the right of collating to which, is by immemorial custom, vested in (lie bishop. Of the donative and presentative church, the lay founder is patron; a right acquired by the acts of foundation (fundi-datio) and endowment [donatio). Of the collative church the bishop is patron, because he is quasi the founder of that, having built it himself, or been principally instrumental in procuring it to he built, or applied to the purpose of religion. See i Bl. i LI. 112. 113. 2 Bl. 21. 22. 23. 24. 3 Inst. 201.
Having investigated the nature of the several kinds of churches, and shewn the origin of the rights of patronage, it remains to en-quire what these rights are. 1 st. Nomination, or the right of naming the clerk. 2nd. Donation or induction, which is the investing with actual possession. 3rd. Visitation, which is the superintending his conduct after he is in possession. The latter is the object of the present enquiry; as it includes deprivation; which is only one of the higher degrees of punishment exercise-able by the visitor. So said my Lord Holt, in the case of the Bishop of St. Davids v. Lucy. Salk. 134. ‘By allowing-..his power to visit, all is admitted; for he that may visit, may deprive as well as censure, these being but several degrees of ecclesiastical punishment; and by the 26 Henry VIII., and the 1 El. c. 1. the only power given to the ecclesiastical commissioners was to visit, without a word of deprivation, yet they were always allowed a power to deprive.’ So that the visitor of the church, whoever he be, is the person empowered to deprive the incumbent. With respect therefore to the right of visitation, as it is one of the rights of patronage arising from foundation and endowment, so it will, in general, be found coupled with them. Thus in collative churches, the bishop alone visits, he having, in some degree, been the founder of the church. In a donative church, the patron is visitor, because he originally founded the church, and so its constitution is the work of his hands; a point which I shall presently incontestibly prove. In presentative churches indeed, the right of continuing to superintend, or in other words to visit, seems to have been encroached on, when the right of approving the nominee was first acquired to the bishop. 1 Mod. 12. It might, perhaps, be thought that if the bishop was the proper person to judge of the fitness of the clerk, he would be the proper person to, judge also how long that fitness continued. But whatever may he the cause why the presentative church varies, in this instance, from the general rule, ‘ that the right of visitation follows the foundation,’is immaterial, because it will be shewn that our churches are donatives, to the visitation of which, therefore, I shall confine my future enquiries. Lord Holt, in his argument in lire case of Philips v. Bury, Holt’s Rep. 724, expresses himself in these words : ‘ But private and particular corporations for charity, founded and endowed by private persons, are subject to the private government of those who erect them; and therefore, if there, he no visitor appointed by the founder, I am of opinion that the law doth appoint the founder and his heirs to be visitors. The founder and his heirs are patrons, and. not to be guided by the common known laws of the kingdom. But such corporations are, as to their own affairs, to be governed by the particular laws and constitutions assigned by the founder. It was said, the common law doth not appoint a visitation at all; I am of another opinion; the law doth, in defect of a particular appointment, make the founder visitor; if he is silent during his own time, the right will descend to his heirs. Yelv. 65. and 2 Cro. 60. So 8 Edward III., 70. and 8 Ass. 29. So that patronage and visitation are necessary consequences, one upon another. For this visitatorial power was not introduced by any canons or constitutions ecclesiastical; it is an appointment of law; it arises from the property which the founder had in the lands assigned to support the charity; and as he is the author of the charity, the law gives him and his heirs a visitatorial power, that is, an authority to inspect their actions, and regulate their behavior, as he pleaseth. Indeed, where the poor are not incorporated, according to the case in 10 Co. there is no visitatorial power; because the interest of the revenue is not vested in them: but where they are incorporated, there, to prevent all perverting of the charity, títere is by law a visitatorial power: and it being a creature of the founder’s own, it is reason he and his heirs should have that power, unless they please to devolve it elsewhere.
! In our old books, deprived by patron, and deprived by visitor, are all one. For it is a benefit that naturally springs out of foundation; and it is in his power to transfer it to another.’ And so in 2 Jur. Eccles. 473. by Twisden. ‘Whenever there is a cure of souls, the church is visitable, either by the bishop if it belong to him; if to a layman he must make delegates, if to the King, my Lord Keeper does it.’ And he cites 1-Mod. 12. And tire author adds, ‘I presume the Judge, in this case, is to be undertood, as to the man’s making delegates, to mean if he finds himself unequal to his duty, then he is bound in conscience to delegate commissioners qualified for it; but not that lie may not do it himself, though he be really able; for it is to be observed, if his commissioners do otherwise than he is convinced in his conscience they ought, he may still undertake and determine it himself, according to conscience, and as he may so take it up. I conceive, no reason can be shewn, why he cannot do it in die first instance; for his commissioners are hut in aid of him, and I conceive, in this case, his power, though more absolute, may be compared to the Ordinary’s authority, who, though ordinarily he judges by his Chancellor, or other official; yet he may sit himself and determine matters within his limited jurisdiction, if he pleases, and have, as is tobe presumed, abilities.’ Moore, 765. Fayrechild v. Gayre. ‘ Pasch. 3. Jac. En bank le roy, surun special verdict fuit adjudge que 1’ineumbent dun benefice donative poit resigner a son patron, et que il esteant del fouridagon le Patron estauxi de son Visitation et correction, et P ordinary n’ ada faire ove luy. 8 Ass. 29. and 32.’ S. C. Cro. Jac. 63. S. P. 1 Mod. 90. Dean of Ferne’s case, Dav. 44. a. 46. b. 47. a. And by Co. Lit. 344. a. ‘A church parochial may be Donative and exempt from all ordinary jurisdiction, and the in-' cumbent may resign to the Patron, and not to the Ordinary; neither can the Ordinary visit, but die Patron by commissioners tobe appointed by him.’ So that this much is certain, that in donative churches the right of visitation is in the Patron. And here we must note that in the case of the King’s donatives, he does not visit in person, 'but‘may make commissioners for that purpose; and if he does not make them,.his Chancellor visits ex officio for him. Thus by F. N. B. 42. a» ‘ The King may have a prohibition directed to the Ordinary, that he shall not visit the hospitals, which are of the King’s foundation, or of the foundation of his predecessors 5 because that the Chancellor of England ought to visit them and no other. And so is it of the King’s or his progenitors free chapels, no Ordinary shall visit them, but the Chancellor of England.’ S. P. Dav. 46. b. ‘ If the King doth found a church, hospital, or free chapel, donative, he may exempt the same from ordinary jurisdiction, and then his Chancellor shall visit tire same. Nay, if the King do found the same without any special exemption, the Ordinary is not, but the King’s Chancellor, to visit the same.’ Co. Lit. 344. a. But ‘the King may, if he pleases, make a special commission.’ 6. II. 4. 14. Dy. 273. As in the case of Waldron v. Pollard, Dyer, 273, the King gave a commission to visit his donative. So in the case of the college of William and Mary in this country, which is of royal foundation, the King did by his charter appoint commissioners for the purpose of visitation, and prescribed the rules for keeping up a perpetual succession of them. So that it appears that the patron of a do-native is visitor of right, and where the King is patron, he may appoint commissioners, but if he does not, his Chancellor visits ex officio for him. And indeed, it is worthy the attention of this court, that if as an ecclesiastical court they should take on them to visit our clergy, and it should appear they are not visitable by any ecclesiastical court, the error is not excused by the law in this as in other cases, where .a judge happens to be mistaken in his opinion, but lie incurs the penalties of a premuniré, which are a forfeiture of property, outlawry, and perpetual imprisonment of the'person. These were first introduced by the stat. 16. R. 2. for drawing causes of temporal cognisance (and all cases of ad-vowsons are tryable by the temporal courts only) ‘ in curiam Ro-manan vel alibi.'’ The word ‘ alibi’ has been construed to extend to any ecclesiastical court. Thus in 12 Co. 38. ‘For as it was resolved by all the Justices, Pasch. 4. Jac. reg.- est contra coronan et dignitatem regiam, when any ecclesiastical Judge doth usurp upon the temporal law, because, as in all those writs it appeareth, the interest or cause of the subject is drawn ad aliud examen, that is, when the subject ought to have his cause ended by the common law, whereunto by birthright he is inheritable, he is drawn in aliud examen (viz.) to be decided and determined by the ecclesiastical law; and this is truly said contra coronara et dignitatem regiam. And this appears by all the prohibitions (which are infinite) which have been directed to the high commissioners and others, after the said act. By 1 Eliz. a fortiori, he who offends in a premuniré shall be said to offend contra coronan et dignitatem regiam. And this in effect answers to all the aforesaid objections; but yet other particular answers shall be given to every of them.
‘ As to the third, although the court by force of high commission is the court of the King, yet their proceedings are ecclesiastical : and for this, if they usurp upon the temporal law, this is the same offence which was before the said act of 10 Eliz. For this was the end of all the antient acts, that the temporal law? shall not in any manner be emblemished by any ecclesiastical proceedings.
‘ As to the fourth, although it be a new court, yet the antient statutes extend to it within this word alibi, and divers new JBish-opricks were erected in tire time of Henry VIII., and yet there was never any question, but, that the antient acts of premuniré, extended to them.’ And in Bro. Abr. 1 find it expressly determined to be a premuniré to call the incumbent of a donative before an ecclesiastical visitation. ‘ Per aliquos benefice donative per !e patron lantum est lay chose et levesque ne visitera, et ideo ne deprivera, et donque sil mella in ce il est in le case de premuniré, et in ce case fuit Barloo evesque de Bathe tempore. E. 6. Et fuit arct de obteiner un pardon, eo que il avoit deprive le deane de Welles que fuit un donative per letters patents le roy per acte de parla* ment ent fait, tamen 8. E. 3. supra ne adjudge. (8 Ass. p,29.’} Bro. Abr. Premuniré 21. So that my conclusions from the premises, so far as necessary in the present question are, That donative churches, being originally founded by a lay-patron, and being still subject to bis donation, are likewise subject to his sole visitation, the ecclesiastical judge having no right to intermeddle: and ■ againj That if the patron be a subject, he may visit either in person or by commissioners; if he be the King, he may also appoint commissioners, but if he make no appointment, the Chancellor visits ex officio.
Our last enquiry is, To what class belong the churches of our government ? are they collatives ? are they presentatives ? or, are they donatives ? Collatives they are not: because these were described as having existed immemorially, and been all that time disposed of by the bishop, which immemorial usage had confirmed the right in law. But our parishes pretend to no immemorial existence, for that would make them older than our government itself: they have been erected by acts of Assembly long within memory, to be found by any one who will recur to our records. Nor was there ever an instance of collation to one of them by-a bishop., ‘If an act of Parliament make a particular district a particular separate and distinct parish, die jurisdiction of the ecclesiastical court does not attach upon it, for this clear reason, that it was not such immemorially. Parish St. John, Clerkenwell, 9 Geo. 2. B. R.’ 2 Jur. Eccl. 348. Neither are our churches of the pre-sentative kind; because of these die distinguishing characteristic is, that, though of lay foundation, yet the bishop has acquired a right of having the clerk presented for his examination, admission, or refusal. But no such right was ever pretended in our churches, nor was there ever an instance in them of presentation to a bishop. But they are of the donative kind. These were said, 1st. to have been founded by lay-men ; 2nd. not to be subject to presentation to a bishop; 3rd.- to lie purely in the gift of the patron. Now let us see if these characters are not applicable to our churches. The act of Assembly, 1661, c. 1. directs that a church shall be built in every parish, and c. 2. that the expenses of building and keeping it in repair, provision for the poor, and maintenance of the minister, be levied on the people of the parish; c. 3. that there be a glebe laid out in every parish, and a convenient house built for the abode of the minister; and that a maintenance be provided for him, which shall be worth eighty pounds per annum, besides his perquisites and glebe. The act of 1696, c. 11. instead of the £80 given the minister by that of 1661, c. 3. gives him sixteen thousand pounds of tobacco, besides his perquisites, to be levied ‘ by the vestries in their respective parishes and lastly the act of 1748, c. 34. (old ed’ns.) sect. 1. confirms this salary to them, to be levied by the vestry ‘upon the titheable persons in their respective parishesand sect. 5. directs that the glebe shall contain two hundred acres of good land at the least, and that there shall be built on it a convenient mansion house, kitchen, bam, stable, dairy, meat house, com house, and garden, the expenses of which are to be levied on the titheable persons in the parish. Here it might be thought prima facie perhaps, that as the parishoners pay the money they are the founders and endowers. But a little attention will, I. think, discover this to be a fallacy. The parishoners are indeed the persons ordered to furnish the money; but the erection of the parishes and gift of the salary, or in other words, the foundation and endowment of the church, is the act of the legislature. They direct an officer to levy sixteen thousand pounds of tobacco on the titheable persons of the parish. As soon as it is in his hands it is the money of the public, and then they order him to pay it to the minister of the parish, just as if the founder of a church should endow it with an annuity which, by his charter of donation, should be payable out of his manor of Blackacre : bis tenants of that manor, though they furnished the money, would hardly be considered as the founders and endowers. Suppose the legislature, instead of directing the payment of these expenses to be levied on the particular parishoners, had ordered the payment out of the public purse ; the foundation and endowment would surely then have been their acts: but what difference can it produce, if instead of ordering the parish collector to pay the money to the treasurer, and him again to the minister, they adopt the shorter method of making the collector pay it immediately to die minister. Our own country furnishes a decisive refutation of this notion. The college of William and Mary is endowed with duties on skins, furs, liquors, tobaccos, paid by the exporters and importers, though given by the legislature. Yet was it never supposed, that that college was founded or endowed by the exporters or importers of these commodities. As little then can the parish-oners, though the parochial taxes be assessed on them, be called the founders and endowers of our churches. The truth is, the parish is erected, the church and its soil given, and also the endowment, by the legislature, or in other words by the community whom they represent. Now that is a civil, not an ecclesiastical body. The churches are therefore of lay foundation. Again, if we consider the community, as made up of King and People, tire King will then be the patron of our churches, it being a known branch of the royal prerogative, that where the King and his subjects are joint founders, the rights of patronage vest in the King. 1 Bl. 481. Or if we consider it in a constitutional point of view, the same consequence will be evolved. For wherever an act of Parliament or of Assembly erects a new office, without prescribing the particular mode of appointing the officer, it belongs to the King to make tire appointment. And for this reason ; that possessing the executive power of the laws, it is his peculiar duty to see such act carried into execution, wffiieh cannot be unless an officer is appointed. 1 Bl. 272. On this principle, is almost every officer in Great Britain, as well as in Virginia, appointed by the crown ; the acts erecting the offices, never prescribing the mode of appointment unless where they mean to give it from the crown. If then our acts of Assembly, erecting cures of souls, and declaring that they shall be given to ecclesiastics of a certain sect, have not said by whom the nomination shall he, it wall follow that the King, who is to see the law executed, must nominate persons for that purpose. We have but two acts relative to this matter. The act of 1661, c. 4. says that a minister, producing to the Governor letters of ordination from some bishop in England, and subscribing, he. the Governor is to induct him into ‘ any parish that shall make presentation of him.’ This law, without doubt, gave the nomination to the parishoners collectively, though it preserved to the crown the right of donation or actual investiture. But the impropriety and inconvenience of popular elections of priests, and the unfitness of the people to judge of their qualifications, had soon caused the vestries to usurp this right, and even their unreadiness to choose where the choice was to be followed by immediate assessments for maintenance, together with the doubt at what time the King might interpose to supply the vacancy, induced the necessity of altering the constitution, of the churches in this respect. In 1748, therefore, the right of nomination was restored to the crown, except for the first twelve months after an avoidance, during which it was given to the vestrymen of the parish. Act 1748, c. 34. (old ed’ns.) s. 7. ‘And whereas it is doubted how long the right of presentation of a minister to a parish, remains in the vestries in this colony: for settling that matter be it enacted, that the sole right of presentation shall be, and remain, in the several vestries, for and during the term of twelve months next after a vacancy shall happen in their respective parishes.’ But perhaps if may be thought that the right of choosing, given by this act !o the vestries in the first instance, is another mark of foundersbip ; and if they are founders, of course they are visitors. This must be answered by distinguishing between the act of nomination, which is given them for a twelve month, and of donation or induction, which is reserved to the crown, and is better expressed by the word investiture. Nomination is defined by Cowell to be ‘ a power to appoint a clerk to a patron of a benefice.’ And he says the word invest, signifies to cove possession. Others,’ says lie, ‘define it thus, invrstitura est in suum jus alieujus iniro-duciio, a giving livery of seisin or possession.’ This, in donative churches, is effected bv the single deed of donation, without other ceremony. Donatives are given and fully possessed by the single donation of the patron in writing, without presentation, institution, or induction.’ Gibs. 819. 1 Burn. Keel. L. 154, And in colla-tives and presentatives it is effected by induction. ‘ Induction is, by the canon law, called corporal possession, and is compared in the books of common law to livery and seisin, by which possession is given to temporal estates.’ Gibs. 814. 1 Burn. Eccl. L, 157. So that the right given the vestry is barely to name for one twelve month, whereas the crown is, on that nomination, to make the deed of donation, or give corporal possession. The act indeed for nomination, uses the word presentation ; the sense of which, as used in the ecclesiastical law, is to present to a bishop, and is in its nature and effect very different from nomination ; and for donation, it uses the word induction, which has indeed the same meaning of delivering actual possession, only that it is usually applied to the delivery of a different kind of church. However our legislators of 1661, were not critics in the language of the law; and it matters not, since they have plainly enough signified what they meant. These rights of nomination and investiture are generally indeed in the same person, and are both exercised by one and the same'act. Thus when in a donative, a patron makes a deed of donation, it is a nomination as well as an investiture. But they may be separated; as happens when the patron grants away the next avoidance. There the grantee has only the right of nominating ; but the grantor or patron is to invest. For says Gibs. 794, ‘ the right of nomination may be in one person, and [lie right of presentation in another. Anfi this is where he who was seized of the advowson doth grant unto another and his heirs, that as.often as the church becomes void, the grantee and his heirs shall nominate to the grantor and his heirs ; who shall be bound to present accordingly. In such case it ivas agreed by the whole court in the case of Shirley and Underhill, Mod. 894, that the nomination is the substance of the advowson, and the presentation no more than a ministerial interest.’ 1 Burn. Eccl. L, 122. Now this is precisely the case between our vestries and the crown under the act of Assembly. The King being considered as the founder and patron of the church, if nothing had been said, would have possessed both rights of nomination and investiture. But the acts give the vestries, for one twelve month, the right of nominating to the Governor, the person whom he is to induct or invest with possession. It is similar to the case of sheriffs and inspectors, who are nominated by the court, but commissioned or invested with their office by the Governor. So in the case of a clerk, it is not the nomination by the vestry, but the Governor’s investiture which puts him into possession, and entitles him to the temporalities of his cure. So that while the act takes from the King, pro tempore, and transfers to the vestry, the right of nomination, which was one of the rights incident to his patronage, it leaves him the ensigns of that right, to wit, investiture. And still the estate in law which was in the King, is made to pass from him by his act of investiture, and not from the vestry by their nomination. So that like the case before cited of die grant of a next avoidance, though die nomination be in the grantee, yet the presentation to the bishop, if it be presentative, or the deed of donation, if it be donative, must be by the patron. He still continues the patron, and he, not the grantee, possesses the right of visitation. Thus dien it may be stated in fewer words. The King is die patron of all our churches. The rights of patronage are 1st. Nomination. 2nd. Investiture. 3rd. Visitation. Only one of these rights, viz. nomination, was taken away, and that but for a limited time. The other two, of investiture and visitation, were not touched, and consequently still remain in him.
We may safely, therefore, conclude that our churches are do-natives, because they wear the three characteristics of donatives. 1. They are of lay foundation. 2. They are not subject to presentation to a bishop. 3. They lie in the gift of the patron. That patron is the King, and though one right of patronage, viz. nomination, is taken away pro tempore, yet the others, of investiture and visitation, still remain in him. The latter is the power now called into exercise; and his majesty having never been pleased to appoint commissioners for that purp'bse, it is to be exercised by his Chancellor here ; that is by the members of this honorable court who possess the powers of the Chancellor ; not indeed sitting on this bench as a court of chancery, but as a court of visitation at any other time or place, at which you shall think proper to call the incumbent before you.
Colonel Bland, who came to the bar as a volunteer in this cause, also admitted the ecclesiastical jurisdiction of the court, but denied, that that gave them cognisance of this matter. He denied that our churches were either donative, presentative or collative, but urged they were sut generis, of a constitution peculiar to themselves, and not resembling any before known to the law. The result of this peculiarity he contended to be, that the right of visitation was in the vestries.
John Randolph, Attorney General, for the defendant,
confined himself entirely to the answering Mr. Wythe, as the other gentlemen had declared against the jurisdiction of the court in this particular case, and so far were in favor of his client. But he contended further that this court had not a general ecclesiastical jurisdiction. The scope of his argument was, that the legislature meant only to give them jurisdiction in testamentary* matters, which are of ecclesiastical cognisance in England ; this being the only branch of that jurisdiction of which they then stood in need, and by no means to extend their cognisance to every other branch of that law.
The court adjudged that they possessed ecclesiastical jurisdiction in general, and that as an ecclesiastical court they might proceed to censure or deprive the defendant, if there should be sufficient cause. But on the importunity of the Attorney General, a re-hearing was granted.